1

2

3

4                       **UNITED STATES DISTRICT COURT**
                          **DISTRICT OF NEVADA**
5

6

7 JAMIE KIRKPATRICK, individually    )    3:09-cv-00600-ECR-VPC
  and as the natural father and      )
8 legal guardian of B.W., a minor,    )    **Order**
                                      )
9       Plaintiff,                    )
                                      )
10 vs.                                )
                                      )
11 WASHOE COUNTY, a political         )
   subdivision of the State of        )
12 Nevada; AMY REYNOLDS; ELLEN        )
   WILCOX; and LINDA KENNEDY,         )
13 individually and in their          )
   capacities as social workers for   )
14 the WASHOE COUNTY DEPARTMENT OF    )
   SOCIAL SERVICES, CHILDREN'S        )
15 SERVICES; SOCIAL SERVICES,         )
   CHILDREN SERVICES; DOES 1-10,      )
16                                    )
        Defendants.                   )
17                                    )
                                      )
18

19      This case arises out of Defendants' placement of minor B.W. in

20 protective custody shortly after her birth.

21      Now pending are Plaintiff's Motion for Summary Judgment (#69),

22 Defendant Washoe County's Motion for Summary Judgment (#70), and

23 Defendants Linda Kennedy ("Kennedy"), Amy Reynolds ("Reynolds"), and

24 Ellen Wilcox's ("Wilcox") Motion for Summary Judgment (#72).

25

26                         **I. Background**

27      Minor B.W. was born five weeks premature on a Tuesday evening

28 in 2008 at Renown Regional Medical Center via cesarean section.

1  Plaintiff, who had just found out that he was one of a few

2  candidates for B.W.'s father, was present for B.W.'s birth; however,

3  he did not sign an affidavit of paternity and was not yet otherwise

4  established as B.W.'s father.  (Defs.' Mot. Summ. J. (#72) Ex. 8 at

5  21; Ex. 5 at 2.)  B.W.'s mother, R.W., admitted to nursing staff

6  that she had used methamphetamine throughout her pregnancy with B.W.

7  and had used as recently as two days prior to B.W.'s birth.  (Defs.'

8  Mot. Summ. J. (#72) Ex. 3.)  Furthermore, B.W. tested positive for

9  methamphetamine at birth, though R.W. did not.  (Id.)  At the time,

10 R.W. was unemployed and had no stable housing, having recently left

11 a rehabilitation program.  (Id.)

12     R.W. volunteered the name of her social worker with Washoe

13 County to hospital staff, who placed a phone call on Wednesday

14 morning to social worker Chondra Ithurralde, who advised placing a

15 protective hold on the infant.  (Id.)  Later that same morning,

16 Ithurralde and Washoe County social worker Ellen Wilcox, who was

17 assigned to investigate the case, interviewed R.W. at the hospital

18 and informed her of the protective hold and the plan for B.W. to be

19 placed in the same foster home as her two siblings.  (Id.)  As a

20 courtesy, the hospital honors the holds requested by Washoe County

21 and does not release children upon discharge to their parents

22 without Washoe County's consent.  (Pl.'s Mot. Summ. J. (#69) Ex. 1

23 at 7.)  Up until B.W.'s discharge from the hospital on Thursday,

24 however, R.W. had normal access to B.W. in the hospital.  (Id. at

25 9.)

26

27

28                                    2

1    After interviewing R.W., Wilcox contacted her supervisor, Linda
2 Kennedy, to discuss B.W.'s circumstances.  (Id.)  Wilcox related to
3 Kennedy that R.W. had, at the time, an open case regarding her two
4 other children, that she had no employment or housing, that she had
5 substance abuse issues, and that she would not be able to provide
6 for a newborn baby.  (Id.)  Based upon these facts, Kennedy
7 authorized the decision to place B.W. in protective custody upon her
8 discharge from the hospital. (Id.)
9    On Thursday morning, B.W. was placed into protective custody
10 upon her discharge from the hospital.  (Defs.' Mot. Summ. J. (#72)
11 Ex. 4.)  Washoe County did not seek a warrant or court order prior
12 to placing B.W. in protective custody.  (Pl.'s Mot. Summ. J. (#69)
13 Ex. 1 at 8.)  In fact, Washoe County had no policy related to
14 warrants at the time.  (Defs.' Mot. Summ. J. (#72) Ex. 1 at 10.)  As
15 of the time of these filings, Washoe County is in the process of
16 developing a policy or protocol for obtaining court orders prior to
17 removing children from their parents' custody, and has only obtained
18 warrants in rare cases involving kidnapping.  (Def.'s Opp'n Pl.'s
19 Mot. Summ. J. (#76) at 8; Pl.'s Mot. Summ. J. (#69) Ex. 2 at 7.)
20 Washoe County's policy at the time was to remove a child if a social
21 worker determined that he or she was in imminent danger; otherwise,
22 the social workers would work on a voluntary case plan with the
23 parents to remedy any issues they determined need attending to.
24 (Pl.'s Mot. Summ. J. (#69) Ex. 1 at 4-5; Def.'s Mot. Summ. J. (#70)
25 Ex. 1 at 31-32.)
26
27
28                                      3

1    Plaintiff found out shortly after B.W.'s placement that she had

2 been removed from her mother's custody.  (Def.'s Mot. Summ. J. (#72)

3 Ex. 8 at 37.)  He gave all his contact information to R.W. with the

4 understanding that Washoe County would soon be contacting him in an

5 effort to determine B.W.'s paternity.  (Id.)

6    A protective custody hearing was held on Friday.  (Defs.' Mot.

7 Summ. J. (#72) Ex. 5 at 2.)  R.W. appeared by telephone because she

8 was still in the hospital recovering from the cesarean section she

9 underwent the previous Tuesday night.  (Id.)  The state family court

10 concluded that B.W. should remain in protective custody, finding

11 that there was reasonable cause to believe that continuation in

12 R.W.'s care was contrary to B.W.'s welfare.  (Id.)  Plaintiff was

13 notified of the hearing but did not appear, as he had returned to

14 Elko, Nevada for work.  (Id.)  The state family court entered an

15 order for genetic testing to determine the identity of B.W.'s

16 father.  (Id.)

17    Plaintiff's paternity was established about two weeks after

18 B.W.'s birth and ten days after the protective custody hearing.

19 (Defs.' Mot. Summ. J. (#72) Ex. 9.)  Plaintiff was served with later

20 petitions and notices of hearings regarding B.W.'s custody, but

21 failed to attend the adjudicatory or dispositional hearings on

22 August 25, 2008 and September 15, 2008, though his paternity was

23 established at that time.  (Defs.' Mot. Summ. J. (#72) Ex. 5 at 2.)

24 Plaintiff did not establish any visitation with B.W. at the

25 dispositional hearing.  (Id.)  Plaintiff twice visited B.W. during

26 her first six months of life.  (Id. at 3.)  Shortly thereafter,

27

28                                    4

1 Plaintiff began attending hearings related to B.W., moved to Reno

2 and established employment, and demonstrated an intent to work

3 toward reunification.  (Id.)  However, as of November 2, 2009, more

4 than a year after B.W.'s birth, the state family court determined

5 that B.W. should continue in foster care and not be placed with

6 Plaintiff.  (Id. at 8.)

7       Plaintiff filed the first complaint (#1) in this Court on

8 October 8, 2009.  The second amended complaint (#54), the operative

9 complaint in this action, was filed on November 4, 2010 with leave

10 of the Court (#53).  In the second amended complaint (#54),

11 Plaintiff brings two claims, one against the individually named

12 Defendants and one against Defendant Washoe County, both arising

13 under 42 U.S.C. § 1983.  In his complaint, Plaintiff asserts that

14 Defendants deprived him of the following constitutional rights:

15       (a) the right to not be deprived of liberty without due
        process of law;
16       (b) the right to be free from unreasonable interference
        with the Parent-Child relationship;
17       (c) the right to procedural due process;
        (d) the right to be free from unreasonable searches and
18       seizures;
        (e) the right to be free from arbitrary intrusions on
19       one's physical and emotional well-being.

20 (Second Am. Compl. (#54) at ¶ 24.)

21       Plaintiff filed a Motion for Summary Judgment (#69) on April 7,

22 2011.  Defendant Washoe County responded (#76) on April 26, 2011,

23 and Defendants Kennedy, Reynolds, and Wilcox responded (#77) on

24 April 29, 2011.  Plaintiff replied (#82) on May 16, 2011.

25

26

27

28                                    5

1       Defendant Washoe County filed a Motion for Summary Judgment

2  (#70) on April 8, 2011.  Plaintiff responded (#79) on May 2, 2011.

3  Defendant Washoe County replied (#85) on May 29, 2011.

4       Defendants Kennedy, Reynolds, and Wilcox also filed a Motion

5  for Summary Judgment (#72) on April 8, 2011.  Plaintiff responded

6  (#80) on May 2, 2011.  Defendants Kennedy, Reynolds, and Wilcox

7  replied (#83) on May 19, 2011.

8

9                        **II. Legal Standard**

10      Summary judgment allows courts to avoid unnecessary trials

11 where no material factual dispute exists.  Nw. Motorcycle Ass'n v.

12 U.S. Dep't of Agric., 18 F.3d 1468, 1471 (9th Cir. 1994).  The court

13 must view the evidence and the inferences arising therefrom in the

14 light most favorable to the nonmoving party, Baqdadi v. Nazar, 84

15 F.3d 1194, 1197 (9th Cir. 1996), and should award summary judgment

16 where no genuine issues of material fact remain in dispute and the

17 moving party is entitled to judgment as a matter of law.  FED. R.

18 CIV. P. 56(c).  Judgment as a matter of law is appropriate where

19 there is no legally sufficient evidentiary basis for a reasonable

20 jury to find for the nonmoving party.  FED. R. CIV. P. 50(a).  Where

21 reasonable minds could differ on the material facts at issue,

22 however, summary judgment should not be granted.  Warren v. City of

23 Carlsbad, 58 F.3d 439, 441 (9th Cir. 1995), cert. denied, 516 U.S.

24 1171 (1996).

25      The moving party bears the burden of informing the court of the

26 basis for its motion, together with evidence demonstrating the

27

28                                6

1 absence of any genuine issue of material fact.  Celotex Corp. v.

2 Catrett, 477 U.S. 317, 323 (1986).  Once the moving party has met

3 its burden, the party opposing the motion may not rest upon mere

4 allegations or denials in the pleadings, but must set forth specific

5 facts showing that there exists a genuine issue for trial.  Anderson

6 v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Although the

7 parties may submit evidence in an inadmissible form--namely,

8 depositions, admissions, interrogatory answers, and affidavits--only

9 evidence which might be admissible at trial may be considered by a

10 trial court in ruling on a motion for summary judgment.  FED. R. CIV.

11 P. 56(c); Beyene v. Coleman Sec. Servs., Inc., 854 F.2d 1179, 1181

12 (9th Cir. 1988).

13      In deciding whether to grant summary judgment, a court must

14 take three necessary steps: (1) it must determine whether a fact is

15 material; (2) it must determine whether there exists a genuine issue

16 for the trier of fact, as determined by the documents submitted to

17 the court; and (3) it must consider that evidence in light of the

18 appropriate standard of proof.  Anderson, 477 U.S. at 248.  Summary

19 judgment is not proper if material factual issues exist for trial.

20 B.C. v. Plumas Unified Sch. Dist., 192 F.3d 1260, 1264 (9th Cir.

21 1999).  As to materiality, only disputes over facts that might

22 affect the outcome of the suit under the governing law will properly

23 preclude the entry of summary judgment.  Disputes over irrelevant or

24 unnecessary facts should not be considered.  Id.  Where there is a

25 complete failure of proof on an essential element of the nonmoving

26 party's case, all other facts become immaterial, and the moving

27

28                                    7

1 party is entitled to judgment as a matter of law.  <u>Celotex</u>, 477 U.S.

2 at 323.  Summary judgment is not a disfavored procedural shortcut,

3 but rather an integral part of the federal rules as a whole.  <u>Id.</u>

4

5                        **III. Discussion**

6 **A. The Complaint Does not Assert a Cause of Action on B.W.'s Behalf**

7        Federal Rule of Civil Procedure 8(a)(2) requires that a

8 complaint contain "a short and plain statement of the claim showing

9 that the pleader is entitled to relief."  Courts have long

10 recognized that the main purpose of the complaint is to provide a

11 defendant with notice of what a plaintiff's claim is and the ground

12 upon which the claim rests.  <u>Self Directed Placement Corp. v.</u>

13 <u>Control Data Corp.</u>, 908 F.2d 462, 466 (9th Cir. 1990) (citing <u>BBD</u>

14 <u>Transp. Co. v. S. Pac. Transp. Co.</u>, 627 F.2d 170 (9th Cir. 1980)).

15 However, mere notice of a grievance is not sufficient - a "plaintiff

16 must at least set forth enough details so as to provide defendant

17 and the court with a fair idea of the basis of the complaint and the

18 legal grounds claimed for recovery."  <u>Self Directed Placement Corp.</u>,

19 908 F.2d at 466 (citations omitted).

20        In his response (#80) to Defendants Reynolds, Wilcox, and

21 Kennedy's Motion for Summary Judgment (#72), Plaintiff asserts that

22 B.W. "is appearing as a Plaintiff to address constitutional

23 violations visited upon her" and she "is seeking recovery for

24 constitutional deprivations cause [sic] to herself, through her

25 guardian, as is required where a minor is involved."  (Pl.'s Resp.

26 Mot. Summ. J. (#80) at 2.)

27

28                              8

1    A reading of the operative complaint (#54), however, does not
2 provide notice to the Defendants or the Court that B.W. is also a
3 plaintiff in this case, or that Plaintiff is asserting a cause of
4 action on her behalf.  For example, the complaint repeatedly refers
5 to "Plaintiff" in the singular throughout, including in the caption.
6 The complaint asserts that "Plaintiff sustained injuries and
7 damages," that "Plaintiff incurred attorney's fees and other
8 expenses, all to <u>his</u> special damage," and that "Plaintiff has been
9 compelled to hire attorneys to vindicate <u>his</u> rights under the law."
10 (Second Am. Compl. (#54) at ¶¶ 19-20, 22)(emphasis added).  Only
11 once does the complaint (#54) assert that "[B.W.]'s constitutional
12 right to be with her parents was violated."  (<u>Id.</u> at ¶ 13).  Read in
13 the context of the entire complaint, this one sentence does not
14 provide notice that B.W. is a plaintiff to this case or that
15 Plaintiff is asserting a cause of action on her behalf.

16    Furthermore, Plaintiff has had numerous opportunities to amend
17 the complaint and properly set forth his claims: this is the fourth
18 complaint filed in this case, and the Court granted (#53) leave to
19 file the latest amended complaint (#54) over Defendants' objections.
20 Plaintiff cannot now assert claims that are not present in the
21 complaint in opposition to a motion for summary judgment.  As such,
22 the Court finds that minor B.W. is not a plaintiff to this case, nor
23 are there claims asserted on her behalf.  The Court now turns to
24 Plaintiff's claims.

25

26

27

28                                    9

1 **B. Liability of the Individual Defendants Under Section 1983**

2      "[Title] 42 U.S.C. § 1983 provides a remedy to individuals

3 whose constitutional rights have been violated by persons acting

4 under color of state law." Burke v. Cty. of Alameda, 586 F.3d 725,

5 731 (9th Cir. 2009) (quoting Caballero v. City of Concord, 956 F.2d

6 204, 206 (9th Cir. 1992)). Where, as here, the defense of qualified

7 immunity is asserted, "[a]n official is entitled to summary judgment

8 on the ground of qualified immunity where his or her 'conduct does

9 not violate clearly established statutory or constitutional rights

10 of which a reasonable person would have known.'" James v. Rowlands,

11 606 F.3d 646, 650 (9th Cir. 2010) (quoting Harlow v. Fitzgerald, 457

12 U.S. 800, 818 (1982)). In Pearson v. Callahan, the Supreme Court

13 authorized the lower courts to grant qualified immunity if the facts

14 shown do not make out a violation of a constitutional right or if

15 the right was not "clearly established" at the time of the alleged

16 violation. 555 U.S. 233-35 (2009); see also James, 606 F.3d at 650-

17 51. In this case, the Court will first consider whether Plaintiff's

18 facts establish that his constitutional rights were violated.

19      "Parents and children have a well-elaborated constitutional

20 right to live together without governmental interference." Wallis

21 v. Spencer, 202 F.3d 1126, 1136 (9th Cir. 2000). For this reason,

22 government officials are required to obtain prior judicial

23 authorization before intruding on a parent's rights unless they have

24 "reasonable cause to believe that the child is in imminent danger of

25 serious bodily injury and that the scope of the intrusion is

26 reasonably necessary to avert that specific injury." Wallis, 202

27

28                                             10

1 F.3d at 1138.  Therefore, in order "to take a child into protective

2 custody without a warrant, the [official] must have reasonable cause

3 to believe that harm will occur in the period of time it would take

4 to procure a warrant and remove the child."  Burke, 586 F.3d at 731-

5 732 (citing Rogers v. Cty. of San Joaquin, 487 F.3d 1288, 1294-95

6 (9th Cir. 2007); Mabe v. San Bernadino Cty, Dep't of Pub. Soc.

7 Servs., 237 F.3d 1101,  1108 (9th Cir. 2001)).

8       Plaintiff argues that B.W. was not in imminent danger of

9 serious bodily injury while she was in the hospital subject to a

10 hold by Defendant Washoe County and therefore could not be

11 constitutionally seized without a warrant or prior court order.

12 Defendant social workers Wilcox and Kennedy admitted that B.W. was

13 not in danger while she was in the hospital and they did not seek a

14 warrant because they were not were not trained on how to obtain a

15 warrant nor when one was necessary.  (Pl.'s Mot. Summ. J. (#69) Ex.

16 1 at 6, 9; Ex. 2 at 8-9.)  Plaintiff has presented, at the very

17 least, a colorable claim of a constitutional violation that would

18 preclude the entry of summary judgment against him: the evidence

19 presented, viewed in the light most favorable to Plaintiff,

20 demonstrates a genuine issue of material fact as to whether B.W. was

21 in immediate danger of serious bodily injury while she was in the

22 hospital, and if so, whether Defendants Kennedy and Wilcox had time

23 to obtain judicial authorization prior to removing B.W.

24       However, before deciding whether Plaintiff's constitutional

25 rights as a parent of B.W. were violated, it is necessary in this

26 case to first determine the extent of Plaintiff's rights at the time

27

28                                11

1  of the alleged misconduct.  The Ninth Circuit has recognized that

2  parents with visitation rights, but no legal or physical custody,

3  have a liberty interest in the companionship, care, custody, and

4  management of their children.  James, 606 F.3d at 651 (citing

5  Brittain v. Hansen, 451 F.3d 982 (9th Cir. 2006)).  These parents'

6  rights, however, are "unambiguously lesser in magnitude than that of

7  a parent with full legal custody."  Brittain, 451 F.3d at 992.

8  Moreover, in the context of determining a putative father's rights

9  arising under the Due Process Clause of the Fourteenth Amendment,

10 the Supreme Court has endorsed "the clear distinction between a mere

11 biological relationship and an actual relationship of parental

12 responsibility," Lehr v. Robertson, 463 U.S. 248, 259-60 (1983), and

13 determined that "'*[p]arental rights do not spring full-blown from*

14 *the biological connection between parent and child.  They require*

15 *relationships more enduring*.'" Id. at 260 (quoting Caban v.

16 Mohammed, 441 U.S. 380, 397 (1979)) (emphasis in original).  That is

17 not to say that a biological father cannot later achieve parental

18 due process rights by forming a familial relationship with the

19 child: "When an unwed father demonstrates a full commitment to the

20 responsibility of parenthood by coming forward to participate in the

21 rearing of his child, his interest in personal contact with his

22 child acquires substantial protection under the due process clause."

23 Lehr, 463 U.S. at 261 (citations and quotation marks omitted).

24 Until a relationship of parental responsibility is formed, however,

25

26

27

28                                        12

1 the Due Process Clause offers little to no protection to an unwed or

2 alleged father.[1]

3    Although it is clear from the evidence submitted in this case

4 that Plaintiff later formed such a familial relationship with B.W.,

5 the evidence viewed in a light most favorable to Plaintiff shows

6 that at the time of the alleged constitutional violation, Plaintiff

7 was not yet a parent to B.W. in anything but the biological sense.

8 Plaintiff, knowing he was one of a few candidates for father of

9 B.W., made the effort to be present for her birth in Reno, despite

10 the fact that he lived and worked far away in Elko, Nevada.  (Defs.'

11 Mot. Summ. J. (#72) Ex. 5 at 2.)  Beyond that, however, he did not

12 have a custodial, financial, or otherwise parental relationship with

13 B.W.  (Id.; Def.'s Mot. Summ. J. (#70) Ex. 8 at 21.)  Plaintiff

14 returned to Elko shortly after B.W.'s birth, having relayed his

15 contact information to B.W.'s mother under the impression that

16 Defendants would contact him in an effort to determine the identity

17 _____

18    [1] At least one district court within the Ninth Circuit has held
   otherwise in a very similar case.  In Murray v. Andrade, No. C08-01539
19 TEH, 2011 WL 3443600, at *3 (N.D. Cal. Aug. 5, 2011), the Northern
   District of California held that "people with potential parental
20 rights, such as alleged fathers whose paternity has not yet been
   established, have a protected liberty interest in the care, custody,
21 and management of their children."  We disagree with the court's
   determination in light of the binding Supreme Court authority cited
22 above.  Moreover, Murray is distinguishable from the case at hand.
   There, the court went on to deny the defendant social worker's motion
23 for summary judgment on the grounds that the plaintiff, the father of
   the child and the child's mother's husband, had presented evidence
24 showing that the defendant had refused to inform him of upcoming court
   dates or tell him any information about how to assert his rights in
25 spite of his repeated efforts.  In this case, Plaintiff was not
   married to the child's mother, and the Defendants notified him of the
26 hearings relating to B.W.'s custody and honored his request for a
   genetic test to determine if he was B.W.'s father. (Def.s' Mot. Summ.
27 J. (#72) Ex. 5 at 2.)

28                                    13

1  B.W.'s biological father.  (Id.)  It is perfectly reasonable for a

2  potential father to forbear from forming a familial relationship

3  with a newborn child until his paternity is established, especially

4  when, as here, he expects that the relevant authorities will

5  determine the issue in the very near future.  Though his attendance

6  at B.W.'s birth was the start of the formation of Plaintiff's

7  relationship with B.W., Plaintiff did not become a parent to B.W.

8  until later in her life, well after she was removed from her mother

9  and placed in protective custody when she was just two days old.

10 For these reasons, Plaintiff had no liberty interest in the care,

11 custody, and management of B.W., and therefore his rights were not

12 violated when Defendants placed her in protective custody without a

13 warrant.  Simply put, Plaintiff did not have constitutionally

14 protected parental rights to B.W. at the time of her placement in

15 protective custody.  At the very most, Plaintiff had a procedural

16 due process right to notice of B.W.'s removal and the follow-up

17 custody hearing, which he was given.  (Def.s' Mot. Summ. J. (#72)

18 Ex. 5 at 2.)  Therefore, Defendants did not violate Plaintiff's

19 rights.

20     Furthermore, even if Plaintiff did have constitutionally

21 protected rights as a parent of B.W. at the time, the individual

22 Defendants are nevertheless entitled to qualified immunity because

23 his potential rights were not yet clearly established.  At the time

24 of the alleged misconduct, the Ninth Circuit had not yet decided

25 Burke, which clearly established that "parents with legal custody,

26 regardless of whether they also possess physical custody of their

27

28                                  14

1  children" have a liberty interest in the companionship, care,

2  custody, and management of their children.  586 F.3d at 733.  It

3  therefore cannot be said that as of 2008, a potential unwed father

4  without legal or physical custody, whose paternity had yet to be

5  determined, had any clearly established rights in the care, custody,

6  and management of his alleged child.  Against this legal backdrop,

7  Defendants did not act unreasonably or clearly unlawfully with

8  regard to Plaintiff, whom they put on notice of B.W.'s situation and

9  the upcoming protective custody hearing.  Accordingly, the

10  individually named Defendants are entitled to immunity.

11       Plaintiff has failed to provide evidence that Defendants

12  violated his constitutional rights, a necessary element of his

13  section 1983 claim.  Furthermore, Defendants are immune from suit as

14  a matter of law.  For the foregoing reasons, Defendants Reynolds,

15  Wilcox, and Kennedy are entitled to summary judgment in their favor.

16  **C. Liability of the County Under Section 1983**

17       A municipality can be sued for "constitutional deprivations

18  visited pursuant to governmental custom."  <u>Monell</u>, 436 U.S. at 690;

19  <u>Wallis</u>, 202 F.3d at 1136.  "To establish liability, [a plaintiff]

20  must show that (1) she was deprived of a constitutional right; (2)

21  the County had a policy; (3) the policy amounted to a deliberate

22  indifference to her constitutional right; and (4) the policy was the

23  moving force behind the constitutional violation."  <u>Mabe</u>, 237 F.3d

24  at 1110-11 (quotation marks and citation omitted).

25       For the reasons stated above with regard to the individually

26  named Defendants, Plaintiff cannot show that he was deprived of a

27

28                                      15

1 constitutional right, a necessary element to his section 1983 claim

2 against Defendant Washoe County.  Although the Court is quite

3 troubled over the fact that, as of these filings, Defendant Washoe

4 County has yet to establish a procedure for obtaining warrants and

5 training its social workers with regard to when it is appropriate to

6 do so, the undisputed facts show that Plaintiff did not have a

7 liberty interest in the custody, care, and management of B.W. at the

8 time of the alleged violation.  Plaintiff therefore cannot show that

9 he was deprived of a constitutional right.  Where there is a

10 complete failure of proof on an essential element of the nonmoving

11 party's case, the moving party is entitled to judgment as a matter

12 of law.  Celotex, 477 U.S. at 323.  Accordingly, the Court will also

13 grant summary judgment in favor of Defendant Washoe County.

14 **D. Plaintiff's Fourth Amendment Claim**

15      It appears that Plaintiff is asserting a Fourth Amendment claim

16 against Defendants for the alleged "seizure" of B.W.  The Ninth

17 Circuit, however, has held that a parent's claim "in this regard

18 should properly be assessed under the Fourteenth Amendment standard

19 for interference with the right of family association," and that a

20 child's claim "should properly be assessed under the Fourth

21 Amendment."  Wallis v. Spencer, 202 F.3d 1127, 1137 n.8 (9th Cir.

22 2000) (as amended).  Accordingly, Plaintiff has no Fourth Amendment

23 claim on his own behalf as his claims are properly brought under the

24 Fourteenth Amendment, which the Court addressed above.  Furthermore,

25 Ninth Circuit precedent dictates that Plaintiff has no standing to

26 claim a violation of B.W.'s Fourth Amendment rights.  See Mabe, 237

27

28                                    16

1  F.3d at 1111 ("Mabe has no standing to claim of violation of MD's

2  Fourth Amendment rights."); see also United States v. Taketa, 923

3  F.2d 665, 670 (9th Cir. 1991) (holding that Fourth Amendment rights

4  are personal and may not be asserted vicariously).  Accordingly,

5  summary judgment in favor of Defendants on this claim is proper.

6  **E. The Protective Custody Hearings**

7       As part of his claim against Defendant Washoe County, Plaintiff

8  alleges that "Defendants presented false testimony at the 72 hour

9  hearing" and that "after Defendants were informed that [B.W.] had

10 suffered abuse while in foster care . . . Defendants made false

11 representations to the juvenile court that [B.W.] was safe in the

12 custody of the foster parents."  (Second Am. Compl. (#54) at ¶¶ 32-

13 33.)  Plaintiff, however, has failed to offer any evidence of false

14 or perjured testimony, rendering summary judgment proper.  Moreover,

15 to the extent that Plaintiff asserts his claim against the

16 individually named Defendants, "social workers are entitled to

17 absolute immunity for the initiation and pursuit of dependency

18 proceedings, including their testimony offered in such proceedings."

19 Mabe, 237 F.3d at 1109 (citing Meyers v. Contra Costa Cty. Dep't of

20 Soc. Servs., 812 F.2d 1154, 1158-59 (9th Cir. 1987)).  "Moreover,

21 social workers 'enjoy absolute, quasi-judicial immunity when making

22 post-adjudication custody decisions pursuant to a valid court

23 order.'"  Mabe, 237 F.3d at 1109 (quoting Babcock v. Tyler, 884 F.2d

24 497, 503 (9th Cir. 1989)).  For the foregoing reasons, summary

25 judgment in Defendants' favor is appropriate.

26

27

28                                    17

**IV. Conclusion**

In spite of Plaintiff's latest assertions to the contrary, the complaint makes clear that Plaintiff is the only plaintiff in this case and that he is not also asserting claims on B.W.'s behalf. Further, the evidence, viewed in a light most favorable to Plaintiff, shows that there was no constitutional deprivation. Plaintiff did not have a liberty interest in the custody, care, and management of B.W. at the time of the alleged violation because he was had not yet established a familial relationship with B.W. Plaintiff does not have a legal basis to bring a Fourth Amendment claim, and he has offered no evidence of false or perjured testimony beyond bare allegations in the complaint. Accordingly, summary judgment must be granted in Defendants' favor.

**IT IS, THEREFORE, HEREBY ORDERED** that Plaintiff's Motion for Summary Judgment (#69) is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant Washoe County's Motion for Summary Judgment (#70) is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendants Linda Kennedy, Amy Reynolds, and Ellen Wilcox's Motion for Summary Judgment (#72) is **GRANTED**.

The Clerk shall enter judgment accordingly.

DATED: December 13, 2011.

_____
UNITED STATES DISTRICT JUDGE

18